LIFE & CASUALTY INSURANCE CO. v. HENRY MITCHELL.

Petition for Certiorari on original opinion denied by Supreme Court, April 4, 1931.

Petition for Certiorari on writ of error denied by Supreme Court, April 30, 1932.

410

W. B. Lamb, Jr., of Fayetteville, and William Waller, of Nashville, for Insurance Company.

Routt & Myers, of Fayetteville, for Henry Mitchell.

B. E. Holman and A. E. Simms, of Fayetteville, for Dryden, Admr.

Sam C. Tigert, of Fayetteville, for Tigert, Admr.

NORMAN FARRELL, Sp. J. In May, 1925, one Frank Mitchell of Lincoln County, Tennessee, applied to the Life & Casualty Insurance Company for a policy of insurance upon his life in the sum of ten thousand ($10,000) dollars. On June 10, 1925, the policy was issued. Henry Mitchell, described in the policy as a brother of the insured, was named as beneficiary. The insured met a violent death on December 17, 1926, in Lincoln County. Proofs of death were submitted, but the Company declined payment.

On June 3, 1927, the company filed a bill in the Chancery Court of Lincoln County against Henry Mitchell, the beneficiary named in the policy; H. E. Dryden, Administrator of the Estate of Grover Howard; Sam C. Tigert, Administrator of the Estate of Frank Mitchell, the insured, seeking to cancel the policy. The facts alleged, on which relief was asked, were as follows:

That the true name of Frank Mitchell was Grover Howard; that a few years prior to the issuance of the policy the insured came into Lincoln County and began living with the defendant Henry Mitchell, both claiming and representing to the public that they were brothers; that they then entered into a conspiracy to defraud complainant and other insurance companies and the said Howard, under the pseudonym of Frank Mitchell, made an application to the complainant for a $10,000 policy of life insurance and designated Henry Mitchell, whom he falsely designated to be his brother, as beneficiary. The bill averred that said application was not made in good faith but in bad faith and by collusion between the insured and the named beneficiary; that the said Henry Mitchell either before or after the issuance of the policy formed a plan to murder Frank Mitchell and collect this insurance and furnished the money to keep the policy alive and had possession of the policy, although he had no insurable interest in the life of insured; and that said Henry Mitchell did, on or about December 17, 1926, murder or procure the murder of Frank Mitchell in such a way as to make his death appear accidental; that said Henry Mitchell had been indicted for such murder but had not yet been tried.

The bill further alleged that in the written application for the policy of insurance the said Frank Mitchell made certain false and fraudulent statements, which were material to the risk as follows:

That his name was Frank Mitchell; that he was born in Tennessee, May 16, 1879; that his age at nearest birthday was forty-six; that Henry Mitchell, the beneficiary, was his brother; and that he, the applicant, would pay the premiums; that he gave wrong information as to the ages, causes of death and date of death of his parents.

Further it was especially charged in the bill that the applicant falsely answered the following questions:

"12. I am not deformed. I have had no bodily or mental disease, nor have I received medical or surgical attention within the past five years—except as herein stated. None."

"6. Have you ever had medical or surgical treatment in a hospital or sanitarium? A. No."

"9. On what dates and for what complaints have you been attended by a physician during the past three years? A. Never was sick."

It was averred that the foregoing answers were wilfully false; that, as a matter of fact, the insured, under the name of Grover Howard, had been committed to the South Carolina State Hospital for the Insane at Columbia, South Carolina, by order of the probate judge of Greenwood County, South Carolina, on December 6, 1920, because of insanity or mental disease; that he was treated in said hospital but was not cured and that he escaped therefrom about May 1, 1921; that these material facts were falsely concealed from the complainant and, had it known same, it was averred, it would not have issued the policy in question. It was further averred that within three years prior to the issuance of the policy the said Frank Mitchell had received medical treatment for gonorrhea and orchitis and that such misrepresentations were made with wilful falseness; that all such misrepresentations were made with actual intent to deceive; that these were matters which increased the risk of loss and because thereof the complainant averred it was entitled to disaffirm the contract of insurance. It was further alleged that, even if the policy were otherwise valid, it would be unenforceable because the beneficiary, Henry Mitchell, had no insurable interest in the life of Frank Mitchell and on grounds of public policy could not recover as he was the murderer of the insured; that the complainant did not contract or agree to pay anyone other than Henry Mitchell and no other person had any interest in the policy; that the defendant, H. E. Dryden, as administrator of Grover Howard, would undertake to collect on the policy for the benefit of the widow and next of kin of the deceased and in order to prevent a multiplicity of suits

he was made a party defendant. It was further averred that Sam C. Tigert qualified as the administrator of Frank H. Mitchell, before it became known that the true name of the deceased was Grover Howard, and he was accordingly also made a party. It was sought to enjoin all the defendants from suing on the policy except by cross-complaint or intervention in this cause.

On June 9, 1927, complainant amended the bill by averring it was advised it was 'not necessary for it, as a condition of relief, to return to Henry Mitchell, or any of the defendants, the premiums paid on the policy. However, it tendered and paid into court the amount thereof ($928.80), two annual premiums, "in order that the court may determine the rights of the parties in the premises and award said amount to whatever party is entitled thereto, this tender being without prejudice to complainant's insistence that it is entitled to retain said premiums under the facts in the case."

To this bill each of the defendants filed an answer and cross-bill.

Henry Mitchell insists in his pleading that Frank Mitchell was really his half brother; that at the time Grover Howard was confined in the insane asylum in South Carolina, Frank Mitchell was seen in North Alabama by numerous persons and, therefore, could not have been Grover Howard; further that he did not kill Frank Mitchell, but that the latter met his death accidentally or else was killed by one John Bridges, the man who testified he saw Henry Mitchell commit the murder.

H. E. Dryden, the administrator of the estate of Grover Howard, rests his case upon the contention that the insured was in reality Grover Howard; that Henry Mitchell murdered him and thereby forfeited all rights as beneficiary in the policy, which should be paid to the estate of the insured; that the misrepresentations in the application were immaterial and that the company in any event assumed the risk of all such matters by issuing a substandard policy with an increased premium for moral hazard.

Sam C. Tigert, the third defendant, administrator of the estate of Frank Mitchell, insisted that he qualified first as the administrator of the dead man, and hence is entitled to the insurance in the event the contentions of H. E. Dryden are upheld.

A very large amount of proof was taken comprising five large volumes.

The Chancellor granted the relief prayed in the bill; held that Frank Mitchell was in reality Grover Howard; and ordered the policy cancelled because of false statements in the application.

From this decree the defendants have appealed to this court and assigned errors.

Under the view we take of the proof in this record two questions are determinative of the case: First, were Frank Mitchell and Grover

Howard one and the same person? Second, were the statements in the application false and material, or, if not material, made with intent to deceive? If these two questions be answered in the affirmative, it is unnecessary to determine whether Henry Mitchell murdered Frank Mitchell and was thereby barred from recovery—a jury having acquitted him of the charge—or whether the proceeds of the policy should go to Dryden, administrator, or Tigert, administrator.

It is our opinion, after a reading of this record, that Frank Mitchell and Grover Howard were one and the same person.

The proof shows they were alike in appearance.

They were born on the same day, in the same month and seemingly in the same year. They were both immoderately fond of hunting and devoted most of their time thereto. They both had a peculiar accomplishment—an ability to place their fingers to their lips and make a noise much like a Jews harp. Will Howard, a brother of Grover Howard, testifies he taught the latter, while a young boy in South Carolina to make this noise. Both men claimed to have been in Mexico, and both pretended to possess the power of telling fortunes.

Grover Howard was a member of a large family in South Carolina. Among his sisters were a Mrs. Roach and a Mrs. McCauley. In 1925 or 1926 Mrs. McCauley died in South Carolina and her estate was being wound up by Miss Julia Charles, a lawyer of that State. Mrs. Roach advised Miss Charles that her brother, Grover Howard, was living in Lincoln County, Tennessee, and going under the name of Frank Mitchell. Miss Charles sent a copy of the petition she had prepared to sell the real estate of Mrs. McCauley to Sheriff Pool of Lincoln County, Tennessee, to serve on Grover C. Howard, rural route No. 2, going under the name of Frank Mitchell. The sheriff wrote back he could not locate the party at the address given. Miss Charles again wrote the sheriff stating she had found the correct address was "care Mrs. Exie Bryant, R. F. D. No. 8, Fayetteville, Tennessee." (Mrs. Bryant being Henry Mitchell's mother in law and living at his home.) Thereupon the sheriff served the process on Frank Mitchell. The sheriff testified that Frank Mitchell denied he was the man wanted, "but was pretty nervous when I told him I had the papers." The sheriff testified that he afterwards had a talk with Henry Mitchell who said to him: "He is the man, Sheriff. I'll tell you some day why he denied it."

Miss Charles, as stated, says she got the information as to Grover Howard's address in Tennessee and the name he was passing under from his sister, Mrs. Roach. Mrs. Roach testified that after her brother, Grover, escaped from the asylum in South Carolina he wrote her from Fayetteville, Tennessee, and advised her to write him

there by the name of "Frank Mitchell;" that both she and her deceased sister, Mrs. McCauley, had correspondence with him thereafter at that address and by that name.

Miss Charles received an answer on August 10, 1926, from Grover Howard to one of the letters she had written him wanting to know if "his sister Martha McCauley's estate has been settled yet" and to send her reply "in care of Mrs. Exie Bryant, Grover Howard, Fayetteville, Tennessee, R. F. D. No. 8." After getting this letter Miss Charles sent the new address, as stated, to Sheriff Pool, who served the papers. Mr. Roach, says he wrote Grover Howard and gave him Miss Charles' address in Greeneville, South Carolina, and told him she was winding up Mrs. McCauley's estate and that he sent the letter to "Frank H. Mitchell, Fayetteville, Tennessee." Mrs. Roach testified she wrote him of his sister, Mrs. McCauley's death. Later, Grover Howard wrote Miss Charles other letters of inquiry about the estate—on November 1, 1926, and November 27, 1926. And a little later he went in person to South Carolina to investigate the estate and saw persons who knew him and stayed with some of his relations and told them he was living in Tennessee with a man named Henry Mitchell. He called on Miss Charles and was in Greeneville at the time of the sale of the personal property of the McCauley estate. He stayed with Mr. and Mrs. Roach for some weeks.

Frank Mitchell for some years before taking out the policy had been paying attention to a lady in Pulaski, Tennessee, Mrs. Zora Harrison. As he was a poor writer his letters to this lady were written by Mrs. Exie Bryant—Henry Mitchell's mother-in-law. Mrs. Harrison says she gave Frank Mitchell "two of her pictures." She wrote her address on the back of one. Both these pictures were taken to South Carolina by Frank Mitchell on his trip to South Carolina and left with his sister, Mrs. Roach, who after her brother had gone back to Tennessee, wrote Mrs. Harrison and Mrs. Harrison kept her advised of the trial of Henry Mitchell for the alleged murder of Frank Mitchell and sent her newspaper clippings of the trial.

When Grover Howard was a young man living in South Carolina before his commission to the asylum, he married. Shortly after his marriage a picture of himself and wife—standing side by side—was taken. His wife—now Mrs. Lula Shaw—identifies this picture and the man as her former husband—Grover Howard. The man in this picture was identified as Grover Howard by his sister, Mrs. Roach, his brother-in-law, Samuel Roach, by his father-in-law, J. W. Garrett, by his brother, M. H. Howard, by Dr. J. E. Boone, Superintendent of the Insane Asylum in South Carolina at the time Grover Howard was committed there.

This same photograph was afterwards shown to a large number of Tennessee witnesses, who knew Frank Mitchell in Lincoln County, Tennessee, and they positively identified the man in the picture as the man they knew by the name of Frank Mitchell. Other evidence is in the record to establish the identity of the two men, but the foregoing has satisfied us. Against this the defendants offer proof of witnesses, who claimed to have known a man named Frank Mitchell in Northern Alabama, in association with Henry Mitchell, and some of them claim to have seen him there during the time (December, 1920—May, 1921) that Grover Howard was confined in the insane asylum in South Carolina. We are not impressed with this evidence. Some of these witnesses were young children at the time—casting their minds back. Others, who endeavor to fix the dates, were speaking long after the event, about a casual acquaintance to most of them, when a particular period of one six months might easily have been confused with another six months in a later year. Undoubtedly the man Frank Mitchell, in company with Henry Mitchell, did accompany the latter on his peddling tours in North Alabama, but we find that this was after his escape from the asylum in South Carolina in May, 1921, and his arrival in Lincoln County, Tennessee.

Passing next to the misrepresentations in the application.

It was shown by the evidence of Dr. J. E. Boone, physician at the South Carolina insane asylum, that Grover Howard, on his admission, was suffering from dementia praecox and his case was so diagnosed and treated. The commitment papers on which he was sent to the asylum, certified to by two physicians, state he was then of unsound mind. We think the company was entitled to know these facts. We think they are such facts as would reasonably influence the judgment of an insurer. Ins. Co. v. Dibrell, 137 Tenn., 537, 194 S. W., 581; Schas v. Ins. Co., 166 N. C., 55; Hughes Bros. v. Ins. Co., 148 Tenn., 301, 255 S. W., 363; Ins. Co. v. Bank, 72 Fed., 428. Two physicians, who testified in this case—examiners for life insurance companies—say that a knowledge of these facts would have been material to the application and we so find. Loving v. Ins. Co., 117 Atl., 323, seems to us a case much in point.

It is argued that Grover Howard never received medical or surgical treatment in the asylum, because no surgeon operated on him and it was not shown that any medicines were given him. However, he was on his arrival put in an ice pack and subjected to the treatment of rest, isolation, diet, etc., usual in such institutions. Medical treatment is much broader in its application than the mere administration of drugs. It includes the science and art of the investigation prevention, cure and alleviation of disease. 40 C. J., 625. That a person may be receiving medical treatment without the actual taking of medicines seems to us to need no authority, but a case can

be found so holding, by a reading of Bragg v. State, 58 L. R. A., 925. The court in that case pointed out that the "rest cure," often employed in mental and nervous troubles, is rarely accompanied by the administration of drugs and that medical treatment is not confined to the administration of drugs and may exist wholly independent of them.

Again it is argued that Grover Howard was not in fact insane, that his insanity was a mere pretense, to avoid trial upon a charge of rape of which he stood indicted. This argument cannot prevail because the proof, as stated, shows he was regularly committed to the asylum on the certificates of two doctors and was treated as a person of unsound mind by the physicians in charge of the asylum. Whether he actually was sane or insane it was his duty to have advised the company of this occurrence and left it to the company to decide. His failure to reveal this fact and other facts, concealed in his application, we find were not only material to the risk but made with conscious intent to deceive.

Again it is argued that the company should be precluded from asking for a rescission and cancellation of the policy since, it is claimed, it issued the policy with full knowledge that Frank Mitchell was a bootlegger, a libertine and of bad moral character and, in fact, charged an extra premium because of these facts. This is true and it strikes the court as strange that any company would desire to insure a person of his character.

While the company knew of and in law accepted the above "moral" hazard, it cannot be said to have accepted the "physical" hazard shown by the personal history of Frank Mitchell, or Grover Howard, which history was concealed from and misrepresented to it in the application.

The insurance company assigns as error the action of the Chancellor in awarding the premiums paid into court by it, without prejudice, to Henry Mitchell and not returning the same to it. We think the company is in no position to make this contention here as it did not appeal from any part of the decree. The contention of the company is that as the defendants have appealed from said decree and assigned errors, the whole case was thereby opened up for hearing de novo and it was at liberty to assign errors. We think the error in this contention is in assuming that the appeal of the defendants in this case had such an effect. As we read the decree the appeal of the defendants was not a broad appeal, but a partial or special appeal only.

The Chancellor in his decree (1) cancelled the policy (2) awarded the premiums paid into court to Henry Mitchell, (3) taxed the costs against Henry Mitchell, Dryden, administrator, and Tigert, ad-

ministrator, in certain proportions. To this decree an appeal was taken as follows:

"To all of the foregoing decree, affecting the rights of Henry Mitchell, Sam C. Tigert, Administrator, and H. E. Dryden, Administrator, each and all now and here except and pray an appeal . . ."

We think this was but a special appeal by the parties named from so much of the decree as was adverse to them. They were all severally interested in securing the insurance and, failing in that, the premiums. It was a contest between them as to who should secure same. They were all equally interested in and made common cause to have the policy declared valid and, if disappointed in that, securing the return of the premiums. None of them were interested in or desirous of seeing the company retain the premiums. The action of the Chancellor in refusing to order the return of the premiums to the company must have been entirely agreeable to all the defendants. They did not complain of that and cannot be said to have appealed from such part of the decree. As stated, the company did not appeal from any part of the decree. We think, on the facts stated, it is not entitled to assign errors on the action of the Chancellor with respect to the premiums. Bell v. Horn, 1 Shannon Cas., 589; Parsons v. Hinzer, 71 Tenn., 352; State ex rel. v. Bolt, 130 Tenn., 212, 169 S. W., 761. As Henry Mitchell had paid or advanced the premiums for the insured, we think the Chancellor properly awarded the return of same to him.

From the foregoing it results that the decree of the Chancellor is affirmed. The costs of the appeal will be taxed equally against Henry Mitchell, Sam C. Tigert, Administrator, and H. E. Dryden, Administrator.

Crownover and DeWitt, JJ., concur.

## OPINION ON PETITION FOR WRIT OF ERROR.

CROWNOVER, J. This case is again before us on petition for writ of error filed by the Life & Casualty Insurance Company to review the decision of the Chancellor awarding to Henry Mitchell the premiums, $928.80, paid by said defendant, Henry Mitchell, to said Insurance Company on the policy for $10,000 on the life of Frank Mitchell that was decreed cancelled for fraud.

The case was disposed of by us on appeal at the last term in a written opinion by Special Judge Norman Farrell, filed on December 19, 1930, in which we held that the policy was obtained by intentional fraud and affirmed the decree of the Chancellor in sustaining the bill for rescission of the policy for fraud, as is fully set out in our original opinion.

In that opinion we overruled the assignment of said Insurance Company as to the Chancellor's decree awarding the premiums to Henry Mitchell, for the reason that appellants had prayed and obtained a special appeal and said Insurance Company had not appealed therefore it could not assign errors.

Now, said Insurance Company has filed a petition for writ of error to again review the question, and it has assigned only one error, and that is, that the Chancellor erred in awarding to Henry Mitchell the premiums, $928.80, paid by it into the registry of the court, as it insists that its tender and payment into court was a conditional tender, to be paid to the party entitled thereto as decreed by the court, and that as the said policy was rescinded and cancelled for intentional fraud the Insurance Company is entitled to retain the fund, citing Jones & Abbott v. Insurance Company, 90 Tenn., 604, 18 S. W., 260; Moore v. Insurance Company, 5 Higgins, 299; 32 C. J., 1237.

The original bill was filed by the Insurance Company against Henry Mitchell and the administrators of the deceased, Grover Howard, named in the policy as Frank Mitchell, for rescission of the policy for fraud, but nothing was alleged in the bill about the tender of the premiums paid to said Insurance Company, but shortly thereafter the following order was entered amending the bill:

"June 9, 1927, Amendments to Original Bill, filed, as follows:

"The complainant amends the original bill in this cause, before answer or other defense made, as follows:

"At the end of paragraph five, and just before the prayer of the bill, insert the following language:

" 'Complainant is advised and avers that as a condition precedent to the relief sought in this bill, it is not required to return to the defendant Henry Mitchell, or any of the defendants, the premiums paid on this policy. Complainant herewith tenders into court, however, the amount of said premiums, being two annual premiums at the rate of $464.40 each, or a total of $928.80, in order that the court may determine the rights of the parties in the premises, and award said amount to whatever party is entitled thereto, this tender being without prejudice to complainant's insistence that it is entitled to retain said premiums under the facts of this case.' "

The Chancellor, after decreeing a rescission and cancellation of the policy for fraud, proceeded to dispose of the premiums paid into court as follows:

"It is further ordered, adjudged and decreed that the premiums heretofore paid into court by complainant Insurance Company on said policy of insurance be and the same, are, adjudged and decreed to the defendant Henry Mitchell, and

the Clerk & Master after deducting the cost accruing in this cause against Henry Mitchell will pay the remainder of said premium to the defendant Henry Mitchell's counsel of record in said cause, upon which sum on their motion a lien is given for the payment of their reasonable solicitor's fees.''

We are of the opinion that the petition for writ of error was properly granted. Different parties to a suit who are separately aggrieved by a judgment, order, or decree, are entitled to separately appeal therefrom or to sue out separate writs of error. 3 C. J., pp. 622, 1006, 1008, 1010, secs. 476, 954, 961 and 964; Bozeman v. Naff, 155 Tenn., 121, 290 S. W., 980.

But we are also of the opinion that the Chancellor was correct in awarding the premiums paid into court to Henry Mitchell, as the proof shows that he had signed the note of the deceased and had to pay the premiums.

It is true that a party guilty of wilful fraud in procuring a policy cannot, after the fraud has been discovered and the policy avoided, maintain an action for the return of the premiums paid by him. Aetna Life Insurance Co. v. Paul, 10 Ill. App., 431; Hoyt v. Gilman, 8 Mass., 336; Friesmuth v. Agawam Mutual Fire Insurance Co., 10 Cush., 588; Fay v. Prudential Insurance Co., 80 App. Div., 350, 80 N. Y. Supp., 683; Himely v. S. C. Insurance Co., 1 Mill. Const., 154, 12 Am. Dec., 623; Elliott v. Knights of Modern Maccabees, 46 Wash., 320, 13 L. R. A. (N. S.), 856, 89 Pac., 926; Jones & Abbott v. Insurance Company, supra; Moore v. Insurance Company, supra; 32 C. J., 1237; 16 Am. & Eng. Ency. of Law (2 Ed.), 954.

But an insurance company seeking to rescind an insurance policy for fraud must tender the premiums and pay them into court, and is not entitled to have them refunded to it when the policy is ordered canceled.

In a suit in equity for rescission for fraud the injured party must make an offer to restore what he has received in return for what he was defrauded into parting with. 3 Williston on Contracts, secs. 1529, and 1530; 9 C. J., 1207; Hill v. Harriman, 95 Tenn., 300, 32 S. W., 202.

''An insurance company seeking to rescind or set aside its policy, on the ground of fraud, false representations, or breach of warranty, must restore or offer to restore to the insured the whole of the premium which he has paid for the policy, or any note given for such premium, and this must be done with reasonable promptness after discovery of the facts relied on for relief, and without it there can be no effective rescission. An exception may be found in the case where the company has sustained actual provable damages in consequence of the fraud practiced upon it. Here, being entitled to offset such damages

against the premium received, it will be entitled to rescind, as against a suit in equity to compel a reinstatement of the policy, without restoring the entire premium." 2 Black on Rescission (1 Ed.), sec. 483; 5 Cooley's Briefs on Insurance (2 Ed.), 4725; Metropolitan Life Insurance Co. v. Freedman, Extr., 159 Mich., 114, 123 N. E., 547, 32 L. R. A. (N. S.), 298; Central Life Insurance Company v. Rosenstein, 46 Ind. App., 537, 88 N. E., 97; Iowa Life Insurance Company v. Haughton (Ind. App.), 85 N. E., 127, 494; Schoneman v. Western Horse & Cattle Insurance Co., 16 Neb., 404, 20 N. W., 284; Delavigne v. United Insurance Co., 1 Johns. Cas., 310; National Counsel, etc., v. Garber, 154 N. W., 512, 131 Minn., 16.

"While it is true that where the policy is obtained by means of fraudulent misrepresentations, the premiums cannot be recovered back by the insured (see 2 May on Insurance (4 Ed.), sec. 567, and cases cited), we think a different rule obtains where the company seeks to avoid the contract on the ground of fraud. In that event, the complainant must recognize the maxim that he who seeks equity must do equity. It would, indeed, be strange if the complainant could say: 'This contract was obtained from me by fraud. Therefore it is void,— void, except as to the provision therein contained that, in the event of fraud, the premiums paid should be retained by the company. As to that provision, it is valid.' No authorities need be cited to show the untenable character of such a claim. At the time the bill was filed, the complainant itself recognized this fact, and it cannot now be heard to urge the contrary. The complainant should have recovered costs in the court below." Metropolitan Life Insurance Co. v. Freedman, 159 Mich., 114, 123 N. W., 547, 32 L. R. A. (N. S.), 303; McEwen v. N. Y. Life Insurance Co., 187 Cal., 144, 201 Pac., 577.

The theory of rescission is that he who seeks equity must do equity, and he cannot have rescission without restoring the status quo. 2 Lawrence on Equity Jurisprudence, secs. 756-7.

It results that the assignment of error must be overruled and the decree of the Chancellor affirmed. The cause will be remanded to the Chancery Court of Lincoln County with direction that the fund be paid to Henry Mitchell as directed by the Chancellor's decree. The cost incident to the writ of error is adjudged against the Insurance Company and the surety on its bond.

## OPINION ON PETITION FOR REHEARING.

This case is again before the court on a petition for a rehearing, in which it is insisted that the repayment of the premiums paid was not necessary for a rescission and cancellation of the policy. We

examined the authorities cited in the petition before we wrote the original opinion, and are content with our former holding. The same paragraph of authority cited, goes on to say:

"The general rule seems to be that an insurance company, suing to cancel a policy for fraud, must restore or tender the premiums received as a condition of relief." 5 Cooley's Briefs on Insurance (2 Ed.), 4725.

The petition is denied.

Faw, P. J., and DeWitt, J., concur.