16910

J. B. ARNOLD, ADM'R. v. LIFE INSURANCE COMPANY OF
GEORGIA

(83 S. E. (2d) 553)

Messrs. *Tinsley & McGowan,* of Greenwood, *for Appellant,*

*Messrs. Nicholson & Nicholson,* of Greenwood, *for Respondent,*

*Messrs. Tinsley & McGowan,* of Greenwood, *for Appellant, in reply,*

Sept. 15, 1954.

OXNER, Justice.

This is a suit on a policy issued by the Life Insurance Company of Georgia on March 7, 1950, effective as of February 22, 1950, insuring the life of Hazel P. Smith for $3,-000.00, in which her husband, Bill Waco Smith, was designated as the beneficiary. The insurer denied liability, claim-

ing (1) that the policy was obtained through fraudulent misrepresentations, and (2) that it was procured by insured's husband with the predetermined intent to murder her and therefore, was void in its inception.

Smith was twice married. He and his first wife separated around Christmas of 1949. During the latter part of January or early in February, 1950, the record does not disclose the exact date, he married the insured, who was then 19 years of age. The application for the insurance in controversy was made on February 22, 1950. Shortly thereafter applications were made to four other companies, resulting in the issuance during the first two weeks in March, 1950, of policies on the life of insured, aggregating (inclusive of the policy now sued on) $7,000.00. None of this insurance was solicited by the agents. In each instance the approach was made by insured's husband, who also accompanied his wife when the application was made and was very active in suggesting answers to the questions propounded. The first premiums on all this insurance were paid by him.

Insured died on April 3, 1950, as a result of being poisoned by her husband. In September, 1950, he was tried and convicted of murdering his wife and sentenced to life imprisonment. The judgment was affirmed by this Court in an opinion rendered on September 27, 1951. *State v. Smith,* 220 S. C. 224, 67 S. E. (2d) 82.

On August 1, 1950, an action on the policy in controversy was instituted by an assignee of the beneficiary. On November 7, 1951, or shortly after the conviction of Smith had been confirmed by this Court, the above action was dismissed.

On April 25, 1952, the instant action was brought on the policy by J. B. Arnold, the duly appointed administrator of the estate of insured. At the conclusion of the testimony, each party made a motion for a directed verdict. That of the administrator was refused. The motion by the Insurance Company was granted upon the ground that the policy was

procured by fraudulent misrepresentations on the part of the insured. This appeal by the administrator followed.

We shall first determine whether there was error in granting the motion of the Insurance Company for a directed verdict upon the ground that the policy was obtained through fraudulent misrepresentations. The answers to the following questions in Part Two of the application are alleged to be false and to have been fraudulently made:

"Name all symptoms, diseases or disorders for which you have consulted a physician or other practitioner during the last five years. Give dates and particulars. If none, so state. None.

"Have you ever had a surgical operation, or been a patient in a hospital or sanitarium? If so, explain fully. No."

\* \* \*

"Have you ever had epilepsy, nervous breakdown, neuritis or paralysis. No."

\* \* \*

"Have you had any disease, impairment or deformity, or have you consulted a physician or other practitioner for any cause not mentioned above? Explain. No."

We have found considerable difficulty in ascertaining the facts which are properly before us in passing on the charge of fraud. In presenting his case, appellant offered in evidence the record of the conviction of Smith for the murder of his wife. He introduced the entire judgment roll from the office of the Clerk of Court, including the affirming opinion of this Court, as shown by the following taken from the transcript of the trial:

"Mr. McGowan: Plaintiff proposes to offer in evidence the conviction of Bill Waco Smith, without proof by the Clerk of Court.

"Mr. Nicholson: Let me see that for a minute. That is the entire record, the Clerk of Court's, the Supreme Court opinion, too?

"Mr. McGowan: Everything is in it as far as I know. It came out of the Clerk's office.

"Mr. Nicholson: That is all right.

"Mr. McGowan: We offer in evidence judgment roll number 3,429, the original record as filed in the office of the Clerk of Court of Greenwood County.

"(Received and marked Plaintiff's Exhibit No. 2)."

Doubtless the foregoing evidence was offered for the purpose of showing that appellant, as administrator of insured's estate, was the proper party to bring this action. However, the record was not introduced with this limitation, but was placed in evidence without qualification or restriction. Under the case of *Greenville County v. Stover,* 198 S. C. 240, 17 S. E. (2d) 535, and decisions therein cited, the judgment roll must be treated as admitted generally, as applicable to any issue it tended to prove, and the contents thereof available to either party to the action. True, the facts stated in the opinion of this Court in affirming the conviction of Smith could not have been admitted without consent of appellant. However, the judgment roll was not admitted without his consent, but at his request, for it was he who offered it in evidence. Under these circumstances, "it is to be considered and given its natural probative effect as if it were in law admissible." *Diaz v. United States,* 223 U. S. 442, 32 S. Ct. 250, 252, 56 L. Ed. 500.

In our opinion above mentioned, *State v. Smith,* 220 S. C. at page 246, and 67 S. E. (2d) at page 92, the following appears:

"Upon defense counsel's stated theory of possible suicide of the deceased; the court admitted the testimony of a member of the medical staff of the State Hospital for the Insane to the effect that the deceased was admitted there as a patient on July 7, 1949, and paroled in the care of her father on Oct. 5, 1949. He diagnosed her mental illness as dementia præcox; she was depressed and objected to confinement

in the hospital, was evasive, suspicious of strangers, and confused mentally. She read her Bible a great deal, underscored passages, professed Christianity and that she was saved. She talked of communication with God and with the birds at home. She was received from Edgewood Sanatorium which is a private institution for the treatment of the mentally ill. She willingly went home with her father when released from the hospital in October, 1949 and was desirous of obtaining work. She did not return to the hospital.

"The founder and director of Edgewood Sanatorium, who is a psychiatrist, also testified for the defense. The deceased was brought to his institution by her father and a social worker on June 22, 1949, and remained there as a patient until July 7, 1949. * * *"

The only reasonable inference to be drawn from the foregoing testimony is that insured, in making the application for this insurance, knowingly concealed, for the purpose of misleading respondent, the fact that approximately eight months previously she had been admitted as a patient to the Edgewood Sanatorium at Orangeburg and that shortly thereafter she was a patient in the State Hospital. This is a fact which she must have known. The company's examining physician found no evidence of insanity and it seems to be conceded that at the time the application for this insurance was made, insured was not under any mental disability. We cannot escape the conclusion that the policy was obtained by fraud.

However, apart from the foregoing, we think the evidence conclusively shows that this policy was obtained by fraudulent misrepresentations in the application. Respondent offered in evidence a judgment rendered by the Probate Judge of Anderson County on July 5, 1949, adjudging that insured was insane and directing that she be committed to the South Carolina State Hospital for care and treatment. Included in this judgment roll is a verified petition, dated June 29, 1949, by the father of the insured, in which he stated that she was then at the Edgewood Sanatorium in

Orangeburg and asked that she be committed to the South Carolina State Hospital. As required by law, the patient was then examined by two physicians who, according to a certificate in the record, found her insane and a proper subject for custody and treatment at the State Hospital. In the patient's history recited in this certificate is a statement, on information furnished by the patient's father, that she was in the Edgewood Sanatorium at Orangeburg from June 22 to June 30, 1949. These physicians further certified that the patient was in good physical condition.

Respondent offered the entire judgment roll in evidence, to which appellant objected. The Court held that the record was competent for the sole purpose of showing that the insured had been adjudged insane, and only admitted in evidence from the judgment roll the order of commitment. In one of the sustaining grounds, respondent argues that the statement in the record by the father that his daughter had been a patient in the Edgewood Sanatorium in Orangeburg was competent as an admission and should be considered by us in determining whether the policy was procured by fraudulent misrepresentations.

We need not pass upon the admissibility of the statement mentioned. From the testimony conceded to be competent, it clearly appears that on July 5, 1949, approximately eight months before the policy was issued, the insured was adjudged insane by the Probate Court of Anderson County and ordered committed to the South Carolina State Hospital. We may presume that the mandate of the court was executed and that she was taken to this institution. This is particularly true in view of the fact that appellant, the father of the insured, who had full knowledge of the facts, did not testify, thereby warranting an inference that his testimony, if presented, would have been unfavorable to his case. From the foregoing it clearly appears that in giving a negative answer to the question of whether or not she had been a patient in a hospital, insured made a false representation as to a material fact.

It may be said in extenuation of the conduct of this young girl that in applying for the insurance, she was an innocent tool of her depraved husband, who, only four or five weeks later, murdered her. But if he gave the fraudulent answers or if they were unwittingly given by her at his suggestion, neither she nor her estate can avoid the consequences.

There is no basis here for waiver. As previously stated, it seems to be undisputed that insured suffered from no mental infirmity at the time of the application. It could not be expected that a physical examination by insurer's physician would disclose the fact that she had previously been in a hospital or sanatorium.

The elements necessary to be shown in order to avoid a policy on the ground of false statements in the application are well established. We have had occasion to consider them in several recent decisions. *Robinson v. Pilgrim Health & Life Insurance Co.*, 216 S. C. 141, 57 S. E. (2d) 60; *Reese v. Woodmen of World Life Insurance Society*, 221 S. C. 193, 69 S. E. (2d) 919; *Lipsey v. Life Insurance Company of Georgia*, 221 S. C. 291, 70 S. E. (2d) 349. As pointed out in these cases, the good faith of the insured is a vital consideration and ordinarily whether a misstatement of fact in the application was made with the intent to deceive and defraud the insurer is a question for determination by the jury. However, where the only reasonable inference warranted by the evidence is that the policy was procured by fraudulent misrepresentations, the Court is warranted in directing a verdict. Such was the case in *Reese v. Woodmen of World Life Insurance Society, supra,* where the showing of fraud was certainly no stronger than that presented in the instant case.

We have found no case in this State involving a misrepresentation as to insured's previous insanity or as to his being a patient in an institution for the treatment of mental diseases. There also appears to be a dearth of authority else-

where involving such a misrepresentation. However, the case of *Life & Casualty Insurance Company v. Mitchell,* 14 Tenn. App. 409, involved facts strikingly similar. It was there held that the failure to advise the insurer of previous confine- ment in an insane asylum was a material misrepresentation entitling the company to cancel the policy. The applicant there answered "no" to the following question: "Have you ever had medical or surgical treatment in a hospital or sanitarium?" The policy was issued in 1925. The evidence showed that in 1920 the insured had been committed to the South Carolina State Hospital for the Insane at Columbia by order of the Probate of Greenwood County and remained in that institution for about six months, suffering from dementia præcox. In holding that the policy was procured by fraud, the Court said: "We think the company was entitled to know these facts. We think they are such facts as would reasonably influence the judgment of ·the insurer." It was also argued there and has been suggested in the instant case, that the insured was not in fact insane. In· answering this contention, the Court said: "Whether he actually was sane or insane, it was his duty to advise the company of this occurrence and left·it to the company to decide. His failure to reveal this fact and other facts, concealed in his application, we find were not only material to the risk but made with conscious intent to deceive."

In view of the foregoing conclusion, we need not pass upon respondent's further contention of fraud with respect to insured's statement in her application that she was not then·negotiating for other life insurance. Nor need we pass upon the further defense that the policy was void in its inception because procured by insured's husband with the predetermined intent to murder her.

We now turn to the contention of appellant that since insured was only nineteen years of age, she is not bound by any representations made in the application and respondent cannot set up the falsity of such representations as a defense to a suit on the policy. It is so held in Rhode Island. *Keenan*

*v. John Hancock Mutual Life Ins. Co.,* 50 R. I. 158, 146 A. 401. But the overwhelming weight of authority is to the contrary. *Prudential Insurance Co. of America v. Ordonoff,* 122 Pa. Super. 485, 186 A. 391; *Carrizales v. W. O. W. Life Insurance Soc.,* 140 Tex. 259, 167 S. W. (2d) 509; *New York Life Insurance Co. v. Zivitz,* 243 Ala. 379, 10 So. (2d) 276, 143 A. L. R. 321; 43 C. J. S., Infants, § 76(b); 29 Am. Jur., Insurance, Section 536. The subject is annotated in 143 A. L. R., beginning on page 331.

We are not in accord with the Rhode Island view. That of the majority, we think, is more logical. An insurance contract made by a minor is voidable at his election but until disaffirmed by him or his representative is perfectly valid. But he cannot split up an entire contract and ratify so much thereof as he considers to his advantage and avoid the balance. In *Dickert v. Aetna Life Insurance Company,* 176 S. C. 476, 180 S. E. 462, 465, the Court quoted with approval the following from Vance on Insurance: " 'It would seem to be a principal too manifestly true to need the support of authority or argument, that an infant party insured must either affirm or disaffirm his contract *in toto.* Every consideration of reason and justice would be disregarded if he were allowed to affirm such terms of the policy as are beneficial and disaffirm those that are found burdensome.' " Since an application for a policy of insurance is an integral part of the contract, it would seem clear that a beneficiary cannot disaffirm a representation or warranty on the ground that the applicant was a minor and at the same time enforce the policy.

A further contention is made by appellant that any right of respondent to contest the validity of the policy on the ground of false representations in the application is barred by the two year statutory contestable period. Sections 37-161 and 37-162 of the 1952 Code. Approximately 26 months elapsed between the date of the policy and the commencement of the instant action. But, as heretofore pointed out, the assignee of the beneficiary com-

menced his suit on August 1, 1950. In answering that complaint, respondent set up the same defense of fraud in the application as was interposed in the instant action. The suit by the assignee was dismissed on November 7, 1951. During the pendency of that action, a period of approximately fifteen months, the running of the contestable period was suspended. In *New York Life Insurance Company v. Hurt,* 10 Cir., 35 F. (2d) 92, 95, the Court said: "Obviously, such 'contest' may be by an equitable action to cancel the policy or by answer in a suit brought to recover under the policy * * * provided such action or such answer be filed within the contestable period. * * * Once having initiated a contest by judicial proceedings within the contestable period, the effect of such contest was, unless thereafter waived, to give the company the benefit thereof in the future, in that or other actions, upon all and only such grounds as were set forth in such contest. It is not necessary that the company be successful in that particular action if the reason for such lack of success be other than a determination of the merits thereof." Also, see *National Life & Accident Insurance Co. v. Wigley,* Tex. Civ. App., 96 S. W. (2d) 154.

Even if we assume that respondent should have known that the beneficiary had forfeited his rights under the policy on account of his felonius act in murdering the insured and brought an action against the estate of the insured to cancel the policy, this could not have been done until the appointment of the administrator on October 4, 1951. Under this view, the running of the statutory period would be suspended pending the appointment of the administrator. *Weston v. Metropolitan Life Insurance Company,* 206 S. C. 128, 33 S. E. (2d) 386, 157 ·A. L. R. 1198, and annotation beginning on page 1204.

Lastly, appellant contends that the Court erred in refusing to direct a verdict in his favor upon the ground that respondent had never refunded to him the premium, or made a tender thereof. The evidence shows that after the death of the insured, respondent refunded the premium of $4.53,

with interest, to Bill Waco Smith, the beneficiary named in the policy and the person who paid same when the application was made. In its answer, respondent alleged that fact and asked the Court to determine the proper party to receive said premium and that it be allowed to pay same into court in the event that Bill Waco Smith was not the party entitled thereto. The trial Judge took under advisement the question of who was entitled to the premium and subsequently filed an order holding that Bill Waco Smith had forfeited all his rights, and that under the circumstances there was no liability on the part of the respondent to refund the premium to anyone.

It is true that an insurance company suing to cancel ██ a policy for fraud, must restore or tender the premiums received as a condition of relief. But respondent not only tendered but paid the premium to the person who would ordinarily have been entitled to receive it. Assuming that subsequent events have shown that this small premium of $4.53 now belongs to appellant, this fact would not require a directed verdict in his favor. The record shows that respondent did everything toward restoring the premium that could be reasonably required of any insurer.

Affirmed.

STUKES, TAYLOR and LEGGE, JJ., and M. M. MANN, Acting Associate Justice, concur.