16939

DOROTHY L. PHILLIPS, Respondent, v. LIFE & CASUALTY COMPANY OF TENNESSEE, Appellant

(85 S. E. (2d) 197)

*Messrs. Mann, Arnold & Mann,* of Greenville, *for Appellant,*

*Messrs. Wells & Maybank* and *Clarence A. Cappell,* of Greenville, *for Respondent,*

December 13, 1954.

OXNER, Justice.

This is an action on a contract alleged to have been made by appellant insuring the life of respondent's infant daughter, Patricia Ann Phillips, for $1,000.00, and designating respondent as the beneficiary.

It is undisputed that no policy was ever issued. The theory of respondent is that under the terms of the application, the insurance became immediately effective upon payment of the initial premium. Appellant admitted receipt of the application and payment of the first premium, but denied

making any contract of insurance. It alleged that after an investigation, it concluded that the child was uninsurable and postponed consideration of the application for a period of one year and offered to return the premium paid. As a further defense, it was asserted that false statements, material to the risk, were made in the application with intent to defraud the company.

When the case was tried, appellant, at the conclusion of the testimony, made a motion for a directed verdict upon the grounds (1) that there was no contract of insurance; (2) that the child was uninsurable; and (3) that if there was any contract of insurance, it was procured by fraudulent misrepresentations. This motion was refused. The trial Judge held as a matter of law that respondent had established a contract of insurance and submitted to the jury only the question of whether such insurance was procured by fraudulent misrepresentations in the application. A verdict was returned in favor of respondent for $1,000.00, the amount of the alleged insurance. The Court below denied a motion by appellant for a judgment *non obstante veredicto* and, in the alternative, for a new trial. The sole question presented is whether the trial Judge erred in refusing appellant's motion for a directed verdict upon the grounds above mentioned.

The application for the insurance in controversy was made by respondent's husband on May 17, 1952. The proposed insured was then about two and a half years old. At the same time he also applied for a policy of $1,000.00 on each of his two boys, aged eight and five years, respectively. Several days later he paid to the soliciting agent $63.71, representing the total premiums for one year on all insurance applied for, and was given a receipt. Included in this amount was the annual premium of $16.55 on the policy applied for on the life of the infant daughter. According to the testimony of the father, this agent, whom he had known for approximately 17 years, told him that when the initial premiums were paid, the insurance "would be in force until

I was notified differently." The agent, a witness for respondent, admitted stating to the applicant that the policies became effective immediately upon payment of the first year's premium.

For some reason not fully explained in the record, there was a delay in forwarding these applications to the home office. The application for the policy on the life of the daughter was not received until June 27, 1952. The home office promptly requested the usual confidential report on the proposed insured. As a result of certain information in this report, the medical director, on July 2nd, mailed an inquiry to Dr. Lonita Boggs, a pediatrician who had attended the child on several occasions. Dr. Boggs' report, which was received by the company on July 11th, disclosed that she had attended this child on several occasions for convulsions, the last treatment being a severe illness in February, 1952. She further answered affirmatively the inquiry as to whether the proposed insured was then in good health.

On July 2nd the company issued the policies on the life of the two boys. When these policies were delivered to their father three or four days later, he asked the agent why the company did not also send the policy on the life of his daughter. The agent replied that "they were probably investigating it." The daughter died on July 14, 1952. According to the testimony of appellant, on July 16th, the company, not knowing of the death of the child, declined to then issue a policy and postponed consideration for one year because of the history of convulsions. The testimony is to the effect that this meant that if the applicant so desired, the company would reconsider the matter at the expiration of one year.

Proof of death was filed on July 19, 1952. About a week later a local agent of the company visited the father, told him the application had been rejected, and offered to return the premium paid, which was refused.

In the application for this insurance, which contemplated the issuance of a policy without examination by a physician,

the father gave the following answers to questions relating to the health and medical history of the child:

"5. (a) When last sick?—Nov. 1950. (b) Nature of last sickness?—Vomiting—Caused for Teething, Dr. Boggs states. (c) How long sick?—4 days.

\* \* \* \* \*

"7. Name below all causes for which Child has consulted a physician in the last ten (10) years. Disease, Injury or Operation—General examination because of baby being born with left arm appr. 2 1/2″ shorter than right. Date—2-15-50. Results—Dr. states baby O.K. Name and address of attending Physicians—Specialist at Shriners' Hospital says baby O. K. in every respect.

"8. Is the Child now in good health?—Yes.

"9. Has Child any physical or mental defect or infirmity? If yes, give particulars.—Baby born with left arm appr. 2 1/2″ shorter than right; 3 fingers on left hand, but has full control and use of same.

\* \* \* \* \*

"11. Has Child had any surgical operation, serious illness or accident?—No."

After answering the foregoing and other questions in the application, the applicant certified: "I have read the answers to the questions in Part B hereof, before signing, and that they have been correctly written, as given by me, and that they are full, true and complete, and that there are no exceptions to any such answers other than as stated herein."

The undisputed testimony shows that this child was treated by Dr. Boggs on five different occasions for convulsions. She was in the Greenville General Hospital from July 16 to July 20, 1950, with convulsions and infestious diarrhea. She was again in the hospital from March 3 to March 8, 1951, the diagnosis being convulsions, conjunctivitis and diarrhea. On January 15, 1952, she had a respiratory infection and sore throat, with convulsions, and was treated by Dr. Boggs in her office. On February 20, 1952,

she had convulsions and otitis media and was again treated in the office of Dr. Boggs. On July 12, 1952, she was admitted to the hospital. She had measles and was in long, continuous convulsion. This illness resulted in death on July 14th. The mother of the child testified:

"Q. And suffered convulsions at the times your husband testified? A. Five times.

"Q. Some of them were very serious? A. Yes, sir.

"Q. So much so you called in a specialist to help save her life? A. Yes, sir.

"Q. Ultimately, she did die, almost suddenly? A. With measles.

"Q. But convulsions carried her out in a few minutes? A. Yes, sir; her fever run high and she died.

"Q. She had been near the point of death once or twice before in those serious convulsions? A. That is right."

Dr. Boggs testified that she did not regard a child having that many convulsions as a good risk for insurance. On cross-examination she was asked why she stated in her report to the company made on July 8th, that the child was then in good health. Her explanation was that she meant that the child was not sick at that time.

Having reviewed, and perhaps at too great length, the facts, we shall now consider whether the trial Judge erred in refusing appellant's motion for a directed verdict. He concluded that under the terms of the application, a contract of insurance arose immediately upon payment of the initial premium. In the view we take of the case, it is unnecessary to pass upon the correctness of this conclusion, or upon the further question, not argued in the briefs, of whether, under the principles laid down in *Moore v. Palmetto State Life Insurance Co.,* 222 S. C. 492, 73 S. E. (2d) 688, an acceptance of the application should be implied from the retention of the premium and failure to reject the application within a reasonable time. It is sufficient to say that we think the motion for a directed verdict should have been granted upon the ground that if an insurance

contract existed, it was obtained through fraudulent misrepresentations in the application.

The applicant stated that this child was last sick in November, 1950, when she was teething When asked to name all causes for which a physician had been consulted in the last ten years, he only mentioned a general examination given the baby in February, 1950, because it was born with one arm shorter than the other. It was further represented that the child had never had any serious illness. It will be noted that none of the matters mentioned in the answers were of such nature as would likely affect the insurability of the child. Not disclosed was the fact she had been in the hospital on two different occasions with serious convulsions and had been treated twice by Dr. Boggs at her office for convulsions, the last time approximately three months before the application was made. These illnesses were not of a trivial nature. The inquiries mentioned above did not relate to matters of opinion or to matters as to which there was a possibility of mistake. The facts concealed were within the personal knowledge of the applicant and could hardly have escaped his attention in answering the questions propounded. Not only were the statements in the application untrue and their falsity known to the applicant, but they were material to the risk and were of such character as would be relied on by an insurer, particularly where, as here, no physical examination was required. It is true that the burden was upon the insurer to further show that the concealment was made with intent to deceive and defraud the company. Ordinarily this is a question for determination by the jury. "However, where the only reasonable inference warranted by the evidence is that the policy was procured by fraudulent misrepresentations, the Court is warranted in directing a verdict." *Arnold v. Life Insurance Co. of Georgia, S. C.,* 83 S. E. (2d) 553, 557.

We think the appellant made out a prima facie case of intent to defraud. From the facts before us, *unexplained,* such an intent will be implied. *Parker v.*

*Pacific Mutual Life Insurance Co.,* 179 S. C. 117, 183 S. E. 697; *Johnson v. New York Life Insurance Company,* 165 S. C. 494, 164 S. E. 175. Frequently the question of fraudulent misrepresentations does not arise until after the applicant is dead. Of considerable importance here is the fact that the applicant is living and although he testified on the trial of the case, nowhere in the record is there any explanation of his concealing material facts in making this application.

Among the later cases sustaining our view that the undisputed facts in the instant case disclose fraud as a matter of law are: *Robinson v. Pilgrim Health & Life Insurance Co.,* 216 S. C. 141, 57 S. E. (2d) 60; *Reese v. Woodmen of World Life Insurance Society,* 221 S. C. 193, 69 S. E. (2d) 919; *Arnold v. Life Insurance Co. of Georgia, supra,* S. C., 83 S. E. (2d) 553.

In reaching the conclusion that appellant is entitled to avoid the policy on the ground of false statements in the application, we have not overlooked the testimony of respondent's husband that after making application to appellant for this insurance, he dropped another policy for $500-.00 which he carried on the life of this child with the Liberty Life Insurance Company. There may be some error as to this for the proof of death filed with appellant shows that this child was insured with the Liberty Life Insurance Company for $500.00. Assuming, however, as we must, the correctness of the testimony mentioned, which was relevant on the question of the good faith of the applicant, *Metropolitan Life Insurance Company v. Bates,* 213 S. C. 269, 49 S. E. (2d) 201, we do not think it was sufficient to require submission of the issue of fraudulent intent to the jury in the face of other uncontradicted evidence conclusively establishing the defense of fraud. Of analogy are our cases holding that the good character of an applicant for insurance is admissible on the question of whether a policy was procured by fraudulent misrepresentations. Yet we held in *Reese v. Woodmen of World Life Insurance Society, supra,*

221 S. C. 193, 69 S. E. (2d) 919, that the Court properly directed a verdict for an insurer upon the ground that the policy was obtained by false and fraudulent representations, although the evidence showed that the insured had an outstanding reputation for honesty and fair dealing. Also, see *Henderson v. Jefferson Standard Life Insurance Co.*, 39 Ga. App. 609, 147 S. E. 901.

The judgment of the Court below is reversed, and the case is remanded for entry of judgment in favor of appellant in accordance with Rule 27.

STUKES, TAYLOR and LEGGE, JJ., and G. BADGER BAKER, A. A. J., concur.