Sharon Rowland **FLOYD**, as Administratrix of the Estate of Robert D. Rowland and Ruby B. Rowland, Richard P. Von Buedingen, John B. Boatwright, Graf Bae Farms, Inc., and William H. Tucker, as Administrator of the Estate of Michael R. Drinkard, Plaintiffs,

v.

The **OHIO GENERAL INSURANCE COMPANY** and Southern Aviation Insurance Group, Inc., Defendants.

Civ. A. No. 88–1037–3.

United States District Court,
D. South Carolina,
Greenwood Division.

Aug. 30, 1988.

J.B. Ness, Desa A. Ballard, and Joseph F. Rice, Barnwell, S.C., for plaintiffs.

George C. Kosko, Columbia, S.C., Thomas J. Strueber, Kathryn L. Johnson, Lord,

Bissell & Brook, Atlanta, Ga., for defendants.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

## INTRODUCTION

This is a declaratory judgment to determine the availability of insurance coverage to plaintiffs resulting from an airplane crash. This case was tried non-jury in Anderson, South Carolina on July 25 and 26, 1988. Plaintiff Tucker appeared at the trial and represented himself, *pro se*. All other parties were represented by counsel.

## STIPULATED FINDINGS OF FACT

The following findings of fact have been agreed upon by the parties to this action:

1. On July 1, 1986, shortly after 11:40 p.m. eastern daylight time, a twin engine Beach Baron aircraft identified as N133P crashed into a wooded area immediately southeast of Runway 3 at the Lynchburg Municipal Airport, Lynchburg, Virginia.

2. At the time of the crash, N133P was being piloted by Michael R. Drinkard, who died in the crash.

3. There were three other occupants of N133P at the time of the crash: the pilot's wife, Gayle C. Drinkard, and passengers Robert D. Rowland (DOB 11/29/35) and Ruby B. Rowland (DOB 7/10/36). All were killed instantly.

4. At all pertinent times, the Federal Aviation Administration (FAA) was a duly existing agency of the United States of America (USA) and was entrusted with the maintenance, control and supervision of various air traffic control facilities including the Lynchburg Control Tower and the Washington Center.

5. At all pertinent times, pilot Drinkard was a co-owner of N133P with his co-owners John B. Boatwright and Graf Bae Farms, Inc.

6. At all pertinent times, Arthur W. Ackerman and David A. Simenauer were employees of the FAA and were acting within the scope of their duties as air traffic control specialists (ATCS).

7. At the time of the crash, pilot Drinkard held an FAA license as a private pilot to fly single and multi-engine aircraft.

8. On Saturday, June 28, 1986, Michael R. Drinkard, Gayle C. Drinkard, Robert D. Rowland, and Ruby B. Rowland departed from Augusta, Georgia in N133P to fly to Ontario, Canada.

9. Drinkard piloted N133P for the entire flight from Augusta, Georgia to Ontario, Canada.

10. While in Canada, Michael Drinkard and Robert Rowland attended a three-day veterinarian educational seminar on foal pneumonia, which both men attended in connection with their individual employment.

11. The decedents departed Ontario, Canada in N133P sometime in the late afternoon or early evening on July 1, 1986.

12. Before departing Buffalo, Michael Drinkard filed an IFR flight plan for the trip from Buffalo to Lynchburg with an alternative destination of Roanoke, Virginia.

13. After missing his second approach at the Lynchburg Municipal Airport, Drinkard failed to execute the proper missed approach procedure. Instead, he banked N133P to the left and attempted to circle the airport beneath the cloud cover.

14. Drinkard attempted unsuccessfully to regain control of the aircraft as he circled the airport.

15. As Drinkard continued to attempt to regain control of the aircraft, N133P transversed the width of Runway 3 at the approach end and crashed into the trees at a location immediately southeast of Runway 3.

16. All occupants were instantly killed.

17. An engine teardown and inspection was conducted by personnel of the National Transportation and Safety Board in conjunction with their investigation of this airplane crash, and no evidence of a mechanical failure was found.

18. At the time of the crash, Michael R. Drinkard did not have a current FAA Medical Certificate as required by FAR 61.23 to exercise the privileges of his pilot's license.

19. Flight weather conditions from Buffalo to Lynchburg required N133P to fly consistently in clouds and precipitation. Instrument meteorological conditions prevailed during the flight from Buffalo to Lynchburg.

## FINDINGS ESTABLISHED BY THE PLEADINGS

The following findings of fact are not in dispute by virtue of the defendants' answers to the summons and complaint in this case.

1. Plaintiff Sharon Rowland Floyd is a resident of the State of South Carolina and is the duly appointed administratrix of the Estates of Robert D. Rowland and Ruby B. Rowland (petition for declaratory relief dated February 9, 1988, paragraph 1; answer of Southern Aviation dated April 21, 1988, paragraph 1; answer of Ohio General Insurance Company dated April 21, 1988, paragraph 1).

2. The defendant Ohio General Insurance Company ("Ohio General") is a corporation organized and existing under the laws of the State of Ohio which transacts business in the State of South Carolina. (Petition, paragraph 2; Answers, paragraph 2).

3. The defendant Southern Aviation Insurance Group, Inc. is a corporation organized and existing under the laws of the State of Alabama. (Petition, paragraph 3; Answers, paragraph 3).

4. The plaintiffs Richard P. Von Buedingen and John B. Boatwright are citizens and residents of the State of South Carolina. (Petition, paragraphs 4 and 5; Answers, paragraphs 4 and 5).

5. The plaintiff William H. Tucker is a citizen and resident of the State of South Carolina and is the duly appointed administrator of the Estate of Michael R. Drinkard, deceased. Prior to his death, Michael R. Drinkard was a citizen and resident of the State of South Carolina. (Petition, paragraph 6; Answers, paragraph 6).

6. The plaintiff Graf Bae Farms, Inc. is a corporation organized and existing under the laws of the State of South Carolina. (Petition, paragraph 7; Answers, paragraph 7).

7. On or about June 1, 1986, Richard P. Von Buedingen, John B. Boatwright, Graf Bae Farms, Inc. and the deceased, Michael R. Drinkard, purchased from the defendant Ohio General an aviation liability insurance policy. (Answers, paragraph 9).

8. On or about July 1, 1986, the plaintiff's decedents were killed when the aircraft N133P crashed while being piloted by the deceased Michael R. Drinkard and while the plaintiff's decedents were passengers aboard the plane. (Petition, paragraph 10; Answers, paragraph 10).

## FURTHER FINDINGS OF FACT

1. For almost ten years, Dr. Von Buedingen had owned various aircraft and had utilized the services of The Stuart Hope Insurance Agency ("Hope") to procure aviation insurance for his aircraft. Hope is located in Columbia, South Carolina and has the ability to obtain quotes from all of the aviation insurance companies currently writing this type insurance in the United States. Owners of aircraft call and furnish information to Hope, which, in turn provides the information to underwriters of the different aviation companies in order to secure quotations on policies of insurance. Each aviation risk is individually rated by the aviation company's underwriter, and the premium quoted will vary based upon the type of aircraft, the experience of the pilots, the use of the aircraft, and where the aircraft will be kept.

2. Dr. Von Buedingen contacted Hope in May of 1985 to request that it obtain quotes for insurance for the recently purchased Baron aircraft owned collectively by his corporation, Drinkard, and Boatwright. At that time, Von Buedingen informed Hope that the three pilots flying the aircraft—himself, Drinkard, and Boatwright—each had a private pilot's license with a multi-engine rating as well as an instru-

ment rating. At that time he also provided the total flight experience for the three pilots, stating that Drinkard had a total of two hundred seventy-five (275) flying hours, of which fifty (50) hours were in the Baron. He affirmatively stated that Drinkard had private, single-engine, multi-engine, and instrument ratings. Based upon this information, Hope obtained a quotation through Southern Aviation Insurance Group ("SAIG") for insurance on the Baron.

3. On May 27, 1986, Hope communicated with Drinkard regarding the renewal of the insurance for the following year. At that time, Drinkard informed Stuart Hope, Jr., of Hope, that the information contained in Defendant's Exhibit 1 was still correct, but that additional flying time had been obtained in the previous year, such that he had a recorded total time of three hundred seventy-five (375) hours. Drinkard stated that he had recorded one hundrd fifty (150) hours in Baron Aircraft, one hundred (100) of which had been obtained in the preceding year. Drinkard again represented that he was possessed of a private, single-engine, multi-engine rating, and an instrument rating.

4. Don Barker of SAIG told Hope that it was licensed to write through Ohio General in Georgia in 1986, and that if the risk was to be written through him, the aircraft must be physically based in Georgia, and there must be a valid Georgia address for the insured.

5. The airplane was ultimately moved from Aiken, South Carolina to Daniel Field in Augusta, Georgia. Dr. Von Buedingen stated at trial that the reasons for moving the airplane to Augusta included the following: decreased insurance premium as a result of obtaining insurance through Ohio General; increased hangar rent in Aiken; availability of better repair facilities in Augusta; and the possibility of entering into a lease arrangement with the aircraft in Augusta.

6. Drinkard provided a Georgia address and further requested that the bills and policy be sent to Dr. Von Buedingen's medical office in South Carolina.

7. Based upon the information provided by Drinkard of flying hours, as well as having an instrument rating, Hope contacted Don Barker of SAIG. Hope conveyed Drinkard's information to Barker who, in turn, evaluated the risk and provided a quotation. At the time the information was provided by Hope to Barker, neither Hope nor Barker knew that Drinkard did not have an instrument rating, nor that he had not flown as many hours as he represented. Barker stated this information was very important in his quoting of the risk, and had he known Drinkard did not have an instrument rating, he would not have quoted, nor written, the policy for the same terms and conditions as he did. He further stated had he known Drinkard did not have an instrument rating, and that his hours were inaccurate, he may have declined the risk altogether. According to both Von Buedingen and Hope, Drinkard knew Hope would convey the information which he provided to the various insurance companies in order to obtain an insurance quotation, and that the markets would rely upon such facts in evaluating the risks, and in determining what quotation, if any, to make to insure the risk. Barker, relying upon the representations made by Drinkard through Hope, provided a quotation for insurance which was ultimately written by Ohio General.

8. Hope acted as an agent of the defendants in respect to the purchase of the insurance policy.

9. The Ohio General policy was mailed to Hope by SAIG. The mail was directed from SAIG's office in Birmingham, Alabama to Hope's office in Columbia, South Carolina.

10. Hope delivered the policy to Richard P. Von Buedingen by mailing it from Hope's office in Columbia, South Carolina to Von Buedingen's office in Aiken, South Carolina.

11. The insureds paid the policy premium to Hope by check dated July 14, 1986, mailed to Hope's South Carolina office. The payment was made on a Georgia bank.

12. The Ohio General policy was paid for on July 21, 1986 by check from Hope, issued on its account at NCNB in Columbia, South Carolina, which was mailed from Hope's South Carolina office to SAIG's office in Alabama.

13. The Ohio General liability policy which is the subject of this action was issued and delivered within the State of South Carolina.

14. The official file maintained by the FAA on Drinkard's license and rating status (Defendants' Exhibit 11) revealed that he did not have an instrument rating. This NTSB investigation (Plaintiff's Exhibit 14, NTSB Report and deposition testimony of NTSB investigator Dickinson, p. 19, 1. 14) also confirmed he did not have such a rating. Plaintiff produced evidence that Drinkard had passed the written examination for the instrument rating about two years earlier and sought to infer that he may have passed the required flight test for the rating (FAR Section 61.65) shortly before the accident. The unrefuted testimony of Virginia State Police Trooper Mark Cannady, however, was that he examined Drinkard's pilots license found in his wallet at the accident scene, and it did not have an instrument rating on it. Moreover, Drinkard could not have taken the required flight test for the instrument rating under the provisions of FAR Section 61.39(a)(3) at any time after the expiration of his medical certificate on November 30, 1985 (Defendants' Exhibit 10, FAR Section 61.23(c) and testimony of Defendants' expert Eggspuehler). Finally, both of plaintiff's experts conceded that in making their analysis of the accident, they concluded Drinkard did not have an instrument rating. Therefore, it is the conclusion of this court that at the time of the crash, Drinkard did not have an instrument rating from the Federal Aviation Administration ("FAA").

15. Drinkard signed an application with SAIG on June 26, 1985, representing he had an instrument rating which was not the truth. Furthermore, The Ohio General contract provides specifically that the statements made on the application are relied upon by the company in the issuance of the insurance contract, and that any misrepresentation of the facts voids the policy.

16. Drinkard's representation to his agent, Hope, that he had an instrument rating was a misrepresentation which was material to the acquisition of aircraft insurance. Drinkard knew the falsity of such representation, and intended Hope to act upon this misrepresentation. Neither Hope, nor Southern Aviation Insurance Group, MGA for Ohio General, knew of the falsity of Drinkard's statement, but they did rely, and had the right to rely, upon such statement. In such reliance, Ohio issued its insurance policy which either would not have been issued at all if the truth were known, or would have been issued on different terms.

17. The Ohio General policy required that Drinkard have an instrument rating from the FAA in order for coverage to be in effect. Under "Section 4—Pilot Requirements" of the policy, it is stated that:

... [the insureds] have agreed that the policy is in effect only if (1) the person operating the aircraft meets the "Pilot Requirements" outlined in this section and in Item 7 of the Declarations....

### Pilot Requirements

1. The only pilots permitted to fly the aircraft are named in Item 7 of the Declarations. At the time of the flight they must have at least the rating stated in Item 7....

\* \* \* \* \* \*

5. The pilot must be licensed and qualified under federal, state and local laws and regulations for all segments of the flight involved.

Item 7 of the declarations states:

Pilot Requirements: This policy is not in effect while the aircraft is in flight or in motion unless the pilot of the aircraft meets all the requirements specified below and in Section 4....

Richard Von Buedingen, Michael R. Drinkard, all are private or commercial, multi-engine, instrument rated pilots.

18. Drinkard did not meet the requirements of Item 7 of the Declarations of the

policy. Likewise, Drinkard did not meet paragraph No. 5 of Section 4 of the policy *supra,* because weather conditions during the flight were, under FAR Section 91.105, "instrument meteorological conditions" requiring that the pilot hold an instrument rating under FAR Section 61.3(2)(1) (NTSB Report, Plaintiff's Exhibit 14 p. 14; NTSB Form 6120.4, p. 8; and deposition testimony of NTSB investigator Dickinson, p. 19, 1. 7). Based on weather reports contained in the NTSB Report and the testimony of Frances Drinkard Rock (by deposition), Arthur Ackerman and Edward Jasek (by deposition), the weather conditions upon arrival at Lynchburg were dark night, intermittent rain, fog, a ceiling of 200–300 feet and visibility of 1–2 miles.

19. According to plaintiff's expert Taylor and defendants' expert Eggspuehler, the instrument rating requirements specified under Federal Aviation Regulations (FAR), both in terms of prior experience and training, and in terms of demonstrated knowledge, skill, proficiency and judgment, are considerable. The requirements for the rating are set out at FAR Section 61.65. Subsections (f) and (g) of that section specify both a written and a flight test to qualify for the rating. The prerequisite for the flight test are specified at FAR Section 61.39 and include, *inter alia,* a valid medical certificate, which Drinkard did not have at any time after November 30, 1985. The general procedures for the flight are set out in FAR Section 61.43, and subsection (a)(4) specifically notes that the demonstrated exercise of good judgment is required for the successful completion of a flight test for the instrument rating. The FAA publication "Flight Test Guide" for the instrument rating (Defendants' Exhibit 13) more specifically sets out the acceptable levels and indicia of performance to be demonstrated in the flight test. Drinkard's conduct of the flight on the night of the accident did not meet these minimum performance standards and, had the flight been a flight test for the instrument rating, Drinkard would have failed the test.

20. Upon arrival in the Lynchburg, Virginia area, Drinkard was cleared for an instrument approach identified as the "Instrument Landing System (ILS) Runway 3" approach. The route to be flown, the minimum altitudes to be maintained, and the procedures to be followed are specified in an approach chart (Defendants' Exhibit 16). Compliance with these approach specifications, routes and procedures is mandatory under FAR Section 91.75 and 91.116.

The ILS system provides electronic guidance to the pilot for both ground track and glide slope. It allows the pilot to navigate solely by reference to his instruments to a point in space two hundred feet above ground and approximately six-tenths of a mile from the end of the runway. At that point, if the criteria for landing specified at FAR Section 91.116 are met, the pilot ceases piloting by reference to his instruments and takes over visually and lands the aircraft. If the criteria are not met, he must abandon the landing attempt and conduct a procedure known as a "missed approach," a mandatory procedure which in the case of the Lynchburg ILS Runway 3 approach calls for a climbing right turn to a navigational fix northeast of the airport from which the pilot, with ATC clearance, can either begin a new approach or fly to an alternate airport which has better weather.

The criteria for continuing the approach and landing specified by FAR Section 91.-116 are in essence two: that the pilot have the runway environment in sight and that he be in a position from which a normal landing can be made. If either one of these criteria is not met, the pilot must immediately abandon his landing attempt and conduct a missed approach under FAR Section 91.116(2). The point in space at which this decision has to be made is called the "decision height" (DH) and is located, in the case of the ILS Runway 3 approach at Lynchburg, two hundred feet above ground and approximately six-tenths of a mile from the end of Runway 3 (Defendants' Exhibit 16).

21. According to the report of the NTSB (Plaintiff's Exhibit 14), and the testimony of NTSB investigator Dickinson (deposition), as well as the testimony of all the expert witnesses offered by both parties, there was nothing about the condition of

the airplane or about the weather conditions which would have prevented Drinkard from successfully landing the aircraft on his first approach. Ackerman, the tower controller, remarked to Mrs. Rock that Drinkard was the only pilot who had "missed" all night. The Flight Test Guide specifies that a candidate for the instrument rating must demonstrate his ability to ". . . descend on a straight-in approach to the DH . . . arriving in a position from which a normal landing approach can be made. . . ." (p. 12, Defendants' Exhibit 13.) Drinkard, contrary to good practice and procedure, (Defendants' Exhibit 12, Section 8) did not declare a missed approach. When quizzed by the tower as to whether he was on a missed approach, Drinkard at first denied it but later admitted he "was off the localizer."

Because Drinkard did not land on the first approach and because there was nothing about the weather or the condition of the aircraft which would have prevented him from doing so, the only conclusion which can be drawn is that Drinkard did not fly the approach to the minimum standards specified for the instrument rating flight test. Had he done so, he could have landed on the first approach. In other words, but for Drinkard's failure to fly an approach which met the minimum standards specified in Defendants' Exhibit 13 for issuance of an instrument rating, the aircraft would have landed and the accident would not have occurred.

22. Instead of properly executing the ILS Runway 3 approach, Drinkard asked for and was given an ATC clearance to fly a second ILS Runway 3 approach. Defendant's expert Coogan reconstructed the flight path and speed of the aircraft on the second approach from radar data recorded by ATC. This flight path and speed reconstruction is depicted in Defendants' Exhibit 29 and shows that the aircraft never established itself on the centerline of the approach course. Indeed, it was so far to the left that, according to Coogan, there would have been a "full-scale deflection" of the course deviation indicator (CDI) needle in that cockpit instrument used to navigate the approach. Under the standards estab-

lished by the Flight Test Guide (at p. 13) for a candidate for an instrument rating, such conduct on a flight test ". . . shall be disqualifying." Additionally, Coogan's calculation of the groundspeed of the aircraft on the second approach shows that the aircraft was flown at an abnormally high rate of speed, perhaps as much as forty to fifty knots higher than the desired approach speed for that aircraft. Again, according to the standards set by the Flight Test Guide (at p. 13), such conduct is considered "disqualifying." The result of these deviations from the minimum level of performance required of a candidate for the instrument rating was that, according to Coogan, the aircraft was never "stabilized" on the approach. He was observed by ground witnesses to be considerably to the left of the runway. One witness, Edward Jasek, estimated he was six hundred feet to the left. This prevented the aircraft from making a "normal" landing upon arrival at DH, although again there was nothing about either the weather or the condition of the aircraft which would have prevented him from doing so. But for his failure to fly the second approach to the minimum level of proficiency required of a candidate for the instrument rating, the accident would not have happened.

23. Because he was unable to make a normal landing at the end of his second ILS approach at Lynchburg, Drinkard was required under FAR Section 91.116(e) to execute the published missed approach procedure which, as noted above, calls for a climbing right turn to a navigational fix several miles northeast of the airport (Defendants' Exhibit 16). Had Drinkard done so, the aircraft could either have been flown back around for another approach, or flown to a different airport with better weather and this accident would not have happened. Drinkard did not fly the published missed approach. Plaintiff's own expert Taylor and defendants' experts Eggspuehler and Coogan all testified that Drinkard's failure to follow the mandatory missed approach procedure under the circumstances, had it occurred on a flight test for the instrument rating, would have re-

sulted in immediate disqualification. In other words, had Drinkard demonstrated the minimum levels of knowledge, skill, proficiency and judgment required of a candidate for the instrument rating by performing the mandatory missed approach procedure, this accident would not have occurred.

Drinkard did not follow the mandatory missed approach procedure. Instead, according to the ATC radar information and the testimony of ground witnesses, he made a left turn at a very low altitude (Jasek said he was concerned the aircraft would hit the control tower, which is located a good distance to the left of the runway and is only one hundred and four feet in height) and attempted to make a tight circle back around to the end of the runway using visual cues which were, according to plaintiff's expert Taylor, "either nonexistent or inappropriate."

24. Although the control zone at the airport had expired about ten minutes earlier thus reducing weather minimums for VFR flight to one mile visibility and remain clear of clouds, Drinkard was not able to maintain VFR conditions by remaining clear of clouds because, according to defendants' expert Coogan, he could not see the clouds at night in poor visibility in order to stay clear of them. This is corroborated by the testimony of plaintiff's eyewitnesses Rock and Jasek, both of whom saw the aircraft fly into clouds after the second approach was abandoned.

25. Both plaintiff's expert Taylor and defendants' expert Coogan testified that Drinkard lost control of the aircraft during the circling maneuver because Drinkard became disoriented and the aircraft was banked too steeply at too slow a speed causing it to stall and enter a spin from which, at such a low altitude, Drinkard could not recover.

26. Drinkard's former flight instructor, Richard Weber, testified that when he last flew with Drinkard in February, 1985, Drinkard "was a long way from being ready" for his instrument rating flight test. Weber also testified that as of that time, Drinkard was not at the point in IFR train-

ing and experience where he could anticipate problems and be prepared to deal with them and that when things deviated from the norm, Drinkard had trouble compensating. Plaintiffs did not offer any affirmative evidence that Drinkard received further instrument training from a certified flight instructor.

27. Although plaintiff's expert Lipscomb testified that in his opinion, the loss of control was precipitated by an engine failure, he acknowledged that he was the only person involved in the investigation to hold this belief. According to the NTSB Report and the testimony of Dickinson, the NTSB did not document any evidence of pre-impact mechanical failure or malfunction. The only physical evidence Lipscomb claimed supported his opinion was, first, that upon visiting the accident site five weeks after the accident, he observed only one "track" of propeller slashes through the trees. However, Coogan testified that whether two separate tracks would be discernable would depend on the angle of impact and the attitude of the aircraft as it went through the trees. According to Coogan, the steeper the angle, the less discernable the two tracks would be, and in this case, the aircraft went in at a seventy degree angle. Lipscomb stated he did not know the attitude of the aircraft as it went into the trees, and therefore, could not state that one propeller track did not mask another. Lipscomb testified the second bit of physical evidence in support of his theory was the different "damage signatures" on the two propellers. However, Coogan testified this is not scientifically reliable, as it depends on what the propellers hit, and in what order, as the plane crashed through the trees to the ground, and this was not documented in the investigation. Thus, no reliable opinions could be formed from the appearance of the propeller blades. Coogan noted, however, that the angle of the blades in relation to the horizontal plane of rotation (which is adjustable) were the same for both propellers, which is strongly suggestive that both engines were producing the same amount of power at impact. Coogan noted in contrast that had there really been an engine fail-

ure, the pilot would have "feathered" the propeller of the dead engine, and post-crash investigation by the NTSB revealed this was not done.

In any event, it is noted that the aircraft should have been able to continue flying on one engine and that candidates for the instrument rating are tested on engine-out emergencies during the approach (Defendants' Exhibit 13, p. 21), and Drinkard's handling of the problem, if there was one, did not rise to the minimum level which must be demonstrated to qualify for an instrument rating.

28. It must be concluded that Drinkard's deviation from the mandatory missed approach procedure after the second approach was voluntary and was, moreover, the product of bad judgment, and experts Taylor, Eggspuehler and Coogan all so testified. This voluntary deviation would have resulted in immediate disqualification on an instrument rating flight test because it did not meet the minimum standards of knowledge, skill and judgment specified in the Flight Test Guide, especially at pages 5 and 22, where it is stated:

> Evaluation shall be on the basis of the applicant's judgment in deciding when to execute the missed approach; the appropriateness of communications and navigation procedures; the ability to maintain positive airplane control....

The accident was the natural and probable consequence of Drinkard's failure to demonstrate the minimum knowledge, skill and judgment required of a candidate for an instrument rating, by failure to fly the mandatory missed approach procedure. Accordingly, the conclusion is inescapable that his failure to hold an instrument rating was causally related to the loss for which plaintiff seeks coverage.

## CONCLUSIONS OF LAW

The defendants contend that the insurance policy was voidable because Drinkard allegedly misrepresented during the application process that he was instrument rated when he was not. In addition, the defendants contend that, at the time of the accident, Drinkard was in violation of the policy provision which permitted only instrument rated pilots to fly the aircraft— "Section 4—Pilot Requirements"—and, therefore, coverage was properly denied for failure to comply with a policy condition. The plaintiffs argue that the defendants failed to properly plead these defenses and therefore have waived the right to assert them at trial. However, because this case had significant connections with both the states of Georgia and South Carolina, this court must first determine which state's law to apply to the issues.

### (a) *Choice of Law*

It is axiomatic that a federal court sitting in diversity must apply the substantive law, including the choice of law rules, of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *Williams v. Mutual of Omaha*, 297 F.2d 876, 879 (4th Cir.1962). Therefore, in this declaratory judgment action the South Carolina choice of law rules apply.

Since this case concerns the interpretation and application of an insurance policy, a South Carolina court would look to the *lex loci contractu*, or the law of the place where the contract was made, when determining which state's substantive laws apply to the issues of interpretation and performance which arise with regard to the insurance policy. *Williams v. Mutual of Omaha*, 297 F.2d 876, 879 (4th Cir.1962); *Canal Insurance Co. v. Ranger Insurance Co.*, 489 F.Supp. 492 (D.S.C.1980); *Long v. Adams*, 280 S.C. 401, 312 S.E.2d 262 (1984); *Barkley v. International Mutual Insurance Co.*, 227 S.C. 38, 86 S.E.2d 602 (1955); *Jones v. Prudential Insurance Co.*, 210 S.C. 264, 42 S.E.2d 331 (1947). *See also* J. & J. Appleman, Insurance Law and Practice § 7079 (1981) cited in *Long v. Adams, supra.* In determining the place of contracting for a policy of insurance, South Carolina courts have looked to a number of factors, including the place of issuance and delivery, *see Long v. Adams*, 280 S.C. 401, 312 S.E.2d 262 (Ct.App.1984), as well as the situs of the risk, *Canal.*

In the instant case the policy was negotiated in South Carolina between the insureds and Hope, acting as agent for the defendants. *See* S.C.Code Ann. § 38–43–10 (Supp.1987). The policy was delivered to Von Buedingen in South Carolina, and the premium payment was paid by a check drawn on a Georgia bank and mailed to Hope's South Carolina office. Although the risk was located in Georgia, the court finds that during the formation stage of the contract the overwhelming number of contacts were with South Carolina. Therefore, the court concludes that the place of contracting for the policy of insurance was South Carolina and, under South Carolina choice of law principles, South Carolina law applies to the merits of the case.

(b) *Waiver*

Plaintiffs argue that the defendants have waived any right to rely on the avoidance defenses they now assert because of the failure to properly plead them in their answer. The defenses of misrepresentation in applying for insurance and failure to comply with policy conditions are affirmative defenses which must be plead and proven by the defendants. Fed.R.Civ. P. 8(c). Generally, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case. However, the waiver of a defense is a harsh sanction, and is not automatically applied merely because an affirmative defense is not included in the answer:

> Where [an affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise, ... technical failure to comply precisely with Rule 8(c) is not fatal.

*Bull's Corner Rest. v. Dir. Fed. Emer. Mgmt. Agcy.*, 759 F.2d 500 (5th Cir.1985), *quoting Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855 (5th Cir.1983); *also citing Dickinson v. Auto Center Mfg. Co.*, 733 F.2d 1092, 1097 (5th Cir.1983). As stated by the court in *Del Costello v. International Brotherhood of Teamsters*, 588 F.Supp. 902 (D.Md.1984), "[r]ule 8(c) is meant to insure for the plaintiff an opportunity to respond to new matter in a meaningful manner." Therefore, before applying waiver the court should first determine whether the plaintiff was truly prejudiced by the defendants' failure to plead the defenses.

For example, in *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326 (7th Cir.1987), the court held that failure to include an affirmative defense in the answer did not result in waiver because the plaintiff was put on notice of the defense by a status report filed with the judge. Since the affirmative defense was apparent from the status report, the *DeValk* court determined that the plaintiff's rights to a trial free from surprise had not been violated and found, moreover, that "plaintiff knew of the issue and in a limited sense by implication consented." *DeValk, supra* at 334, (quoting *Mason v. Hunter*, 534 F.2d 822, 825 (8th Cir.1976)).

The circuit courts have uniformly allowed a party to assert affirmative defenses, although not specifically set forth in the answer where, as in the instant case, the plaintiff has been put on notice of defendant's avoidance defense. *See* 5 Wright & Miller, Federal Practice and Procedure, § 1277 and § 1309. The harsh sanction of waiver is generally limited to circumstances where the plaintiff has no notice of the defense and is completely surprised and prejudiced by defendant's late assertion of the defense. *See* 5 Wright & Miller, Federal Practice and Procedure, § 1278.

In the instant case, the plaintiff was put on notice of the avoidance defenses now relied on by defendants during prior litigation in Georgia which occurred one and one-half years prior to the filing of this action. *See Ohio General Ins. Co. v. Graf Bae Farms, Inc., et al.*, C.V. 86–302 (Superior Ct. of Columbia County, Ga.1988). Furthermore, once the present action was filed, plaintiff was again put on notice of the defenses by defendants' motion to dismiss, motion for summary judgment, oral argument before the court, and Rule 16(b) interrogatory responses. Therefore, plaintiff cannot now maintain that it was unfairly prejudiced or surprised by defendants' assertion of the avoidance defenses, and

plaintiff's case at trial evidenced that they had prepared for the defenses.

In this case, defendants have moved, pursuant to Fed.R.Civ.P. 15, to amend their answer to conform to the evidence proffered at trial. Rule 15 provides, in pertinent part:

If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party and maintain the party's action or defense upon the merits.

Subsection (a) of Rule 15 further provides, "leave [to amend] shall be freely given when justice so requires."

Grant of leave to amend is discretionary with the court and is governed by the Rule 15(a) principles and the policy of the Federal Rules to allow resolution of disputes on the merits whenever possible. *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.1980). In *Davis* the court reversed the trial court's denial of leave to amend relying on the considerations set forth in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962):

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

On the basis that defendants have adequately put plaintiffs on notice of affirmative defenses, and under the authority of Rule 15 allowing for liberal amendment, the court has determined that the defendants should be allowed to amend their pleadings.

### (c) *Misrepresentation*

Under South Carolina law, an insurer may avoid coverage under an insurance policy when it establishes that: (1) the insured made a false statement in the insurance application; (2) that the insured knew was false when made; (3) that was material to the risk covered in the policy; (4) that the insurer relied on; and (5) that was made with the intent to deceive. *Gasque v. Voyager Life Insurance Company of South Carolina*, 288 S.C. 629, 344 S.E.2d 182, 184 (1986); *Strickland v. Prudential Insurance Company of America*, 278 S.C. 82, 292 S.E.2d 301, 304 (1982); *United Insurance Company of America v. Stanley*, 277 S.C. 463, 289 S.E.2d 407, 408 (1982).

The first of these elements is satisfied in this case because, as reflected in the findings of fact, the evidence is overwhelming that Dr. Drinkard's representation in the insurance application that he was an instrument rated pilot was false.

Similarly, as to the second element—knowledge of falsity—there can be no doubt that Dr. Drinkard knew when he made the representations in the insurance application that they were not true. Dr. Drinkard was a licensed pilot chargeable with knowledge of the FAA regulations that distinguish between a visual flight rating and an instrument rating. He had received some training for the instrument rating and talked with friends and relatives about the tests needed to obtain one. Despite his knowledge of the regulations, on at least two occasions he represented to Ohio General that he was an instrument rated pilot when, in fact, he was not. At the same time, no one knew better than him that the statements were false. "The facts [Dr. Drinkard] concealed were within [his] personal knowledge ... and could hardly have escaped his attention in answering the questions propounded." *Phillips v. Life & Casualty Insurance Company of Tennessee*, 226 S.C. 336, 85 S.E.2d 197, 199 (1954).

When Dr. Drinkard signed the insurance application containing the false statement concerning his pilot qualifications and ratings he adopted that statement as his own. *Pittman v. First Protection Life Insurance Co.*, 72 N.C.App. 428, 325

S.E.2d 287 (1985). Furthermore, in signing that application he certified the truthfulness of the answers. Because of his aviation background and knowledge of the FAA regulations, Dr. Drinkard knew the difference between a visual flight rating and an instrument flight rating and he knew he was not rated for instrument flight. Therefore, Dr. Drinkard knew his representation was false when made.

■ Third, the evidence in this case establishes that Dr. Drinkard's misrepresentation was material to the insurance risk. In *Atlantic Life Insurance Co. v. Hoefer*, 66 F.2d 464 (4th Cir.1933), insurer brought an action to have an insurance policy declared void because of the insured's false statements in his application. In discussing the materiality requirement the court in *Hoefer* stated:

[A] representation is material when reasonably careful and intelligent men would regard the fact involved as substantially increasing the chances of the loss insured against; and that this is especially true when the insurer, on becoming aware of the fact, *would raise the rates or reject the risk altogether.*

66 F.2d at 466. (Emphasis added).

Similarly, in *Southern Farm Bureau Casualty Insurance Co. v. Ausborn*, 249 S.C. 627, 155 S.E.2d 902 (1967), an insured falsely denied in his insurance application that he had been arrested or convicted of a driving offense during the past three years. In holding that these false statements were material to the insurance application and authorized insurer to avoid coverage under the policy, the court in *Ausborn* stated:

The statement made in the application *signed by the [insured]* that he had not been convicted of any traffic violation during the past three years was false and untrue.... A representation is material when the insured knows or has reason to believe that *it will likely affect the decision of the insurance company as to the making of the contract of insurance or as to its terms.*

*Id.* 155 S.E.2d at 908. (Emphasis added). *See also, Government Employees Insur-*

*ance Co. v. Chavis*, 254 S.C. 507, 176 S.E. 2d 131, 137 (1970) (information in insurance application used to determine the extent of the risk and the premium to be charged).

When these standards are applied to the facts in this case it is clear that Dr. Drinkard's misrepresentation concerning the instrument rating was "material" to the risk. Dr. Drinkard, a highly educated man with post-graduate professional training, had been a pilot for many years. He knew that before the FAA issued any flight rating an applicant was required to demonstrate competency in aviation skills in both written examinations and flight tests. He also knew that the FAA had set minimum flight qualifications and experience levels before aircraft ratings could be applied for. Because of his aviation background Dr. Drinkard either knew or had reason to believe that his representations concerning his pilot qualifications and ratings would affect Ohio General's decision either to accept the risk or to fix the terms of that insurance coverage. Moreover, Von Buedingen, Boatwright and Marion Hope all stated they had discussed with Drinkard this request for information from insurers and the fact that insurers needed it to assess the risk.

In addition, underwriter's testimony at trial establishes that Dr. Drinkard's statements concerning his instrument rating, medical certificate and recent experience in the aircraft were all relied on when the underwriter decided to accept this risk. Furthermore, had underwriters known the true facts concerning Dr. Drinkard's flight rating, the policy would have been issued on different terms. Therefore, Dr. Drinkard's misstatement concerning his flight ratings was material because Dr. Drinkard should have known it would affect insurer's decision concerning the terms of the insurance policy.

As to the fourth element, an Ohio General underwriter testified at trial that before Ohio General issued its policy it relied on Dr. Drinkard's representation concerning his pilot qualifications. In *Government Employees Insurance Co. v. Chavis*, 254 S.C. 507, 176 S.E.2d 131, 133–134 (1970),

the South Carolina Supreme Court stated with respect to an insurer's reliance on representations in insurance applications that:

> Representations in an application for a policy of liability insurance should not only be true but full. The insurer has the right to know the whole truth. If a true disclosure is made, it is put on guard to make its own inquiries and determine whether or not the risk should be assumed. A misstatement of material facts by the applicant takes away the opportunity to estimate the risk under its contract. (Citation omitted.) *Where a fact is specifically inquired about, or a question so framed as to elicit a desired fact, a full disclosure must be made, and the insurer has the right to rely upon the answer.* An applicant is required to make full answers without evasion, suppression, misrepresentation or concealment of material facts so that such statement will represent his knowledge of the hazards of loss. (Citation omitted). If an applicant undertakes to state the circumstances which can affect the risk, he must do so fully and faithfully.

*Id.* (Citations omitted). *See also, Southern Farm Bureau Casualty Insurance Co. v. Ausborn,* 249 S.C. 627, 155 S.E.2d 902, 907–8 (1967).

In *Chavis,* the insured misrepresented in an insurance application that he had not been involved in any accidents within the past five years, that he had not had his driver's license suspended, and that he had no driving violations within the past three years. The South Carolina Supreme Court observed that these facts "... were considered by the [insurer] in order to arrive at a proper rate classification and a determination of the premium to be charged ...," *Chavis,* 176 S.E.2d at 137, and held that these misrepresentations entitled insurer to avoid coverage because the insurance policy was deemed rescinded.

Similarly, in the case at bar Ohio General relied on Dr. Drinkard's false statement entitling them to avoid coverage under the policy.

Under South Carolina law, an intent to deceive may be inferred when there is no other reasonable or plausible explanation for the applicant's false representation. Thus, in *Cain v. United Insurance Co.,* 232 S.C. 397, 102 S.E.2d 360, 361 (1958), an insured represented to a life insurance company that he was in good health and had not been hospitalized for sickness within the last two years. The insured had, in fact, been twice hospitalized for heart problems. On these facts, the court upheld a directed verdict for the insurer, stating:

> There is no evidence that when the Company issued this policy it had any knowledge or reason to believe that the insured had heart trouble or had ever been confined in the veterans hospital for this or any other disease. It is also clear that the application would not have been accepted had the true facts been disclosed. The only reasonable inference warranted by the evidence is that the policy was procured by fraudulent misrepresentations. [The insured] ... certainly knew that within the past two years he had received medical treatment at the veterans hospital. This material fact could not have escaped his attention and we can only infer from his negative answer to question 9 that he intended to deceive the Company.

*Id. See also, Phillips v. Life & Casualty Insurance Company of Tennessee,* 226 S.C. 336, 85 S.E.2d 197, 200 (1954) (directed verdict for insurer proper when "only reasonable inference warranted by the evidence is that the policy was procured by fraudulent misrepresentation"); *Southern Farm Bureau Casualty Insurance Co. v. Ausborn,* 249 S.C. 627, 155 S.E.2d 902, 907–08 (1967) (intent to deceive may be deduced from circumstances surrounding the application).

In this case, each one of Drinkard's false statements made him appear a more qualified and experienced pilot than he really was, and therefore, a more attractive risk to the insurance company. Dr. Drinkard's qualifications as a pilot could not have escaped his attention in 1985 and again in 1986. According to Von Buedingen, Boat-

wright and Hope, Drinkard knew why the company requested the information. The only reasonable inference to be drawn is that Dr. Drinkard intended to deceive Ohio General.

Therefore, it is the finding of this court that Dr. Drinkard's misrepresentation that he was instrument rated was a material misrepresentation which allows Ohio General to avoid coverage under the policy.

(d) *Violation of the Policy Provision*

■ The defendants also contend that Ohio General properly denied coverage under the aviation insurance policy because Dr. Drinkard intentionally operated his aircraft in instrument flight conditions without an instrument rating which was a violation of a condition under "Section 4—Pilot Requirements" of the policy.

Under South Carolina law, an insurer must establish that the violation of an insurance policy condition or exclusion somehow contributed to or caused the loss before it may properly deny coverage under the insurance policy. *South Carolina Insurance Co. v. Collins*, 269 S.C. 282, 237 S.E.2d 358 (1977). However, the insurer need not show that the violation was the sole or even the predominant cause of the loss, only that it was a cause or a contributing factor. *Cf., Gibson v. Gross*, 280 S.C. 194, 311 S.E.2d 736 (1984) (negligence need not be the sole cause of plaintiff's injury so long as it is a cause of injury). *See also, Reynolds v. Life & Casualty Ins. Co. of Tennessee*, 166 S.C. 214, 164 S.E. 602 (1932) ("In order to defeat a recovery ... there must appear a connecting link between the [policy violation] and the death.... There must be some causative connection between the act which constituted a (policy violation) and the death of the insured.") *Outlaw v. Calhoun Life Insurance Co.*, 238 S.C. 199, 119 S.E.2d 685, 690 (1961) ("[A]n exclusion clause in an insurance contract ... will not be permitted to prevent recovery unless the insurer is able to show ... some causal connection between the insured's condition and his injury and the death of the insured.") (Emphasis added); *Smith v. Sovereign Camp, W.O.W.*, 204 S.C. 193, 28 S.E.2d 808, 811 (1944) ("It seems fair to say that there must be some causal connection between the accident and the [policy violation]...."). The South Carolina Supreme Court has further indicated that a violation which increases the risk of loss will be deemed as contributing to or causing the resulting loss. *Smith v. Sovereign Camp, W.O.W.*, 204 S.C. 193, 28 S.E.2d 808 (1944).

In *Sovereign Camp*, an insurer sought to avoid a double indemnity provision in a life insurance policy because the insured died in an auto accident when on authorized liberty while in the military. Insured's life insurance policy excluded double indemnity benefits "while the member is in the military ... service in time of war." In holding that the insurer had to first establish that the insured's activity in the military contributed to the insured's death before this limitation would apply, the court in *Sovereign Camp* stated:

> By the same reasoning now, the facts in the case at bar do not show *any increase of risk*, nor any difference of status of the young soldier who was killed in an automobile wreck while at his own home on furlough from the service. To hold that the term of the policy apply *where there is no connection whatsoever* between the accident and the enlistment in the army or other military service would seem to be an unfair discrimination not based on sound reason and not actually expressed in the policy.
>
> \*       \*       \*       \*       \*       \*
>
> It seems fair to say that there must be some causal connection between the accident and the military service, under and in contemplation of all of the pertinent language of the policy.

Contrary to the facts in *Sovereign Camp*, in this case Dr. Drinkard's operation of the aircraft in instrument weather conditions without an instrument rating increased the risk of injury such that there is a causal nexus between Dr. Drinkard's lack of an instrument rating and the cause of the aircraft accident. Flight in instrument weather conditions requires greater pilot skill and experience than flight in visual

weather conditions. Therefore, the probability that a pilot without an instrument rating will crash on encountering instrument flight conditions is significantly greater. As discussed in the findings of fact, Dr. Drinkard's actions prior to the crash indicate that he failed to demonstrate the minimum knowledge, skill and judgment required of a candidate for an instrument rating. Therefore, it is the conclusion of this court that the non-qualification was causally connected to the accident and the defendants, and the violation of the policy condition entitles the defendants to deny coverage.

THEREFORE, IT IS ORDERED that defendants' motion to amend the answer, pursuant to Fed.R.Civ.P. 15, to conform to the evidence offered at trial is hereby granted.

FURTHERMORE, based on the foregoing findings of fact and conclusions of law, the court finds that liability coverage was properly denied under Ohio General Aviation Insurance Policy No. 45490.[1]

The Clerk of Court is directed to enter judgment for the defendants, The Ohio General Insurance Company and Southern Aviation Insurance Group, Inc.

IT IS SO ORDERED.

---

1. Based on the findings and conclusions herein, the court finds it unnecessary to reach the issues involving the aircraft's airworthiness certificate, Dr. Drinkard's medical certificate, the charge for the flight or SAIG's status as an agent or insurer.